### 17653

Annie W. R. FREEMAN, Executrix of the Will of E. L. Freeman, Respondent, v. KING PONTIAC COMPANY, Appellant

(114 S. E. (2d) 478)

See also 114 S. E. (2d) 486.

336

*Messrs. Ramon Schwartz, Jr.,* of Sumter, and *W. Cannon Matthews* and *J. Bratton Davis,* of Columbia, *for Appellant,*

338

*Messrs. George D. Levy* and *Clifton G. Brown,* of Sumter, and *Robinson, McFadden & Dreher,* of Columbia, *for Respondent,*

*Messrs. Ramon Schwartz, Jr.,* of Sumter, and *W. Cannon Matthews* and *J. Bratton Davis,* of Columbia, *for Appellant, in Reply,*

May 5, 1960.

OXNER, Justice.

This action was brought to recover damages for alleged breach of a contract of employment made by E. L. Freeman with King Pontiac Company, Inc. While other issues are raised by the pleadings, the primary question is whether Freeman was wrongfully discharged. Both the master, to whom the case was referred, and the Circuit Judge found that King Pontiac breached the contract but differed as to the measure of damages. This appeal by the employer followed.

King Pontiac Company, Inc., a South Carolina Corporation, was organized in 1950. It operates the Pontiac agency in Columbia. The original stockholders and directors were F. B. Davis, Jr., Winchester Graham and E. L. Freeman. In late 1951 or early 1952 Graham sold his interest to Bray's Island Plantation, Inc., a corporation owned by Davis. C. W. Pratt was then elected a director in the place of Graham. In August, 1955, the 40 shares of stock in the corporation were held as follows: 38 shares by Bray's Island Plantation, Inc., 1 share by F. B. Davis, Jr. and 1 share by E. L. Freeman.

Davis was formerly the president of the United States Rubber Company and of certain DuPont and General Motors subsidiaries. Since his retirement he has lived on a plantation in South Carolina. He has been president of King Pontiac since its organization. Freeman, a friend of Davis, was a machinery dealer at Sumter, South Carolina. He was made vice-president and secretary of King Pontiac and was later elected treasurer, assistant to the president and general manager. He was not as active in the affairs of the corporation as his titles would indicate. He made his home in Sumter and had no office at the place of business of the King Pontiac Company. There is some dispute in the testimony as to the time he devoted to the business. Most of the witnesses said he gave very little of his time and that his visits to

the office of King Pontiac were very infrequent. C. W. Pratt of New York, a business associate of Davis, was made assistant treasurer, although it is conceded that he was very inactive. W. R. Matthews has been operating manager of the corporation since it was formed and in general charge of the business. In 1952 he was named assistant secretary. The principal other employees at the times pertinent here were W. H. Moore, Jr., who was office manager, and B. J. Moser, bookkeeper.

The contract involved in this controversy was executed on February 15, 1952. Under the terms of this instrument, which superseded all previous agreements, King Pontiac employed Freeman as "general manager" at an annual salary of $10,000.00, payable monthly. He was also to be paid his expenses not to exceed $5,000.00, "plus 10% bonus on the profits of the company before taxes and bonuses." As general manager Freeman was empowered, "subject to the general supervision of the President and the Board of Directors", to "manage the affairs of the Corporation in the regular course of its business." He was required to make reports to the president, the board of directors and to "perform any and all of the duties which may be properly assigned to him by the President or the Board of Directors." Paragraph 5 of this agreement was as follows: "This agreement shall become effective on the date of its execution and shall remain in force until cancelled. This agreement may be cancelled upon twelve (12) months written notice signed by the President, a majority of the Board of Directors of the Company or by the Employee."

Freeman was regularly paid his salary and expenses as provided by the above contract and the business was apparently operated without friction until August, 1955. On August 4th of that year, Matthews, the operating manager, left for New York on a week's vacation, leaving Moore, the office and sales manager, in charge of the business. Matthews testified that before leaving he had found some of the salesmen looking at the books and for this reason had instructed

Moore not to permit anyone to inspect them during his absence. For a number of years prior to 1955, Freeman, as secretary and treasuer of the corporation, had selected an Atlanta firm to audit the business. His authority to employ auditors rather clearly appears. On August 6th, while Matthews was in New York, an auditor from the Atlanta firm came to Columbia, at the request of Freeman to make a special audit of a certain part of the business. Later during that day Moore stated to this auditor that he had instructions not to permit anyone to look at the books. A controversy ensued. Finally late that night this auditor called Matthews in New York and told him that he had been denied access to the books. There is some dispute as to the attitude of Matthews. He claims that on August 9th he wrote Freeman a letter stating that he had not contemplated an auditor coming to Columbia during his absence and that he was entirely agreeable to making the books available for this purpose. Plaintiff contends that Freeman never received such a letter and that Matthews not only refused to let this auditor have the books but sent a very insulting message by him to Freeman.

On August 10, 1955, Freeman brought suit in the name of the King Pontiac Company against Matthews, Moore and Moser to get possession of the books and records. On the same day the late lamented Judge Eatmon issued an order temporarily restraining said defendants from interfering with Freeman in obtaining access to the books and records of the company and in conducting the business affairs of the corporation, and directing them to show cause on August 20th why said restraining order should not be made permanent. On the following day, on petition of defendants, the restraining order was modified in certain particulars and Matthews recognized as active general manager. When the friction developed between Matthews and Freeman, Davis, the president, was in Scotland. He had been there since June. Immediately after the suit was instituted Matthews contacted Davis and advised him of what had been done. On

August 12th, Davis sent to Freeman the following cablegram:

"I have been advised of action brought by you in name of King Pontiac Company against W. R. Matthews and other I have considered the matter and as president and chief executive officer and controller of $97\frac{1}{2}\%$ of KP stock am directing the defendant to open all records for examination Also I am directing you hereby to withdraw immediately legal action Stop I think it best for King Pontiac for you not to interfere with Matthews in the management of the King Pontiac Company and I so direct."

Freeman was given access to the books and the audit proceeded. Although no further steps were taken in the litigation prior to the return of Davis to South Carolina about the middle of September, no effort was made by Freeman to withdraw his suit or terminate the litigation. Davis testified that this litigation was "causing Billy be Damned with the business." Matthews said that it "completely demoralized the whole business"; that there was about a 50% drop in sales; that he, Moore and Moser had to be out of the office for a considerable length of time; and that they were "constantly harassed with lawyers and auditors." He further testified: "The auditors—four or five different sets of auditors that came in, and as soon as he (Freeman) fired one, another would come in and go around King Pontiac and make the employees sign statements as to their personal accounts; if you go around five different times to the employees, and five different auditors, checking up to see if their personal accounts are right—that in itself—five times in about five or six weeks period—is certainly enough to start rumors or spread fire or pour fuel on the fire. * * *" (The audit when completed disclosed no irregularities in the conduct of the business.)

A meeting of the stockholders of King Pontiac Company, Inc., was held on September 23, 1955. According to the minutes, there had been no meeting of the stockholders for a number of years and the directors had simply held over un-

der the by-laws. The meeting was denominated as a "deferred annual and special meeting." All stock was represented by proxy except the one share held by Freeman. As to him, the minutes disclose the following:

"The chairman * * * presented to the meeting a written request for notice of said meeting directed to Mr. E. L. Freeman, as Secretary of the company, and signed by the holders of 97½% of the issued and outstanding stock of the company. He also presented to the meeting an affidavit of mailing of such request for notice signed by Mr. F. B. Davis, Jr. * * *. The chairman said two telegrams addressed to Mr. F. B. Davis, Jr., purportedly from E. L. Freeman, had been received and that such telegrams alleged the calling of the meeting to be improper. He stated that in the light of the registered notice of the meeting sent by the holders of 97½% of the outstanding stock and the fact that Mr. Freeman has actual notice of the meeting that the meeting duly convened at 12:05 o'clock P.M., September 23, 1955, at the office of the Company, in accordance with the by-laws and competent to proceed with the business of the meeting."

At this meeting F. B. Davis, Jr., Jean Reybold Davis and C. W. Pratt were elected directors to hold office until the next annual meeting of the stockholders and until their successors were elected and qualified.

Later during the day a meeting of the newly elected Board of Directors was held at Bray's Island Plantation, South Carolina. All the directors waived in writing notice of the meeting. It was attended by F. B. Davis, Jr., and Jean Reybold Davis who constituted a majority of the Board and under the by-laws a quorum. F. B. Davis, Jr., was elected president and treasurer and Jean Reybold Davis secretary. Matthews was elected general manager. All other offices previously held by E. L. Freeman were declared vacant until the further action of the Board. At this meeting Davis, the chairman, called attention to the contract made with Freeman on February 15, 1952 and stated "that he believed that

Mr. Freeman's recent actions in bringing an unauthorized suit purportedly in the name of the company and refusing to obey the directions of the president with respect to the same required the board to discharge Mr. Freeman for cause as General Manager of the company in accordance with the authority vested in the board &#42; &#42; &#42;." A resolution was then adopted immediately terminating, for the reasons stated by Davis, the contract made with Freeman. The president was authorized and directed to give notice to Freeman of the termination of his contract and to take any further action necessary to accomplish said purpose. The chairman then called attention to the fact that Freeman "had refused to withdraw and terminate the action although expressly directed so to do by the president and by Mr. Pratt, one of the directors of the corporation", and that a hearing in said case was to be held on September 24th. A resolution was then adopted authorizing the president in the name of the corporation to request the Court to terminate and dismiss said action and to take any and all steps necessary to bring same to an immediate conclusion. A further resolution was adopted directing the president to take any action necessary to recover damages sustained by the corporation on account of the suit instituted by Freeman.

Pursuant to the resolution adopted at the above mentioned meeting of the directors, Davis, as president, wrote Freeman on September 23rd that his contract of February 15, 1952 was terminated and that he had been removed from the office of general manager. This letter was delivered to Freeman the following day.

A hearing in the case brought by Freeman was had before Judge Eatmon on September 24th. Both Davis and Freeman were present. Thereafter on September 28, 1955 Judge Eatmon issued an order dismissing the action and vacating the restraining orders previously issued by him. In this order he recited that since the commencement of the action Davis, the president, and Pratt, one of the directors, had directed Freeman to withdraw the action and that new directors had

been elected who, at a meeting held on September 23rd, had gone "on record as censuring Mr. Freeman for his failure to discontinue the action and affirmed that it was the desire of the new board that the action be dismissed."

Mr. Freeman died on December 13, 1957. This action was brought by his executrix in April, 1958 to recover damages for breach of the contract entered into on February 15, 1952. In addition to denying liability and alleging that Freeman was discharged for cause, the defendant interposed two counterclaims, one for damages alleged to have been sustained by the corporation as a result of Freeman's suit, and the other for the purchase price of a Pontiac car which Freeman had bought prior to his discharge.

After taking the testimony, the Master filed a report in which he concluded that the action of Freeman in instituting the suit and refusing to discontinue same was proper; that he was wrongfully discharged; that the termination of the contract became effective at the expiration of one year from the date of his discharge; that he was entitled to his salary from September 1, 1955 to September 24, 1956 (defendant admitted liability for the salary from September 1st to 24th, 1955); and that the defendant had not made out its counterclaim for damages on account of the institution of the action by Freeman. He also found that the plaintiff was entitled to recover, as conceded by defendant, the sum of $1,-852.97, representing bonus on the gross profits of the corporation for the fiscal year ending April 30, 1955. He further held, which was conceded by the plaintiff, that the defendant was entitled to recover of plaintiff the sum of $3,-178.99, representing the purchase price of the automobile bought by Freeman. He stated that all amounts awarded should bear interest at the legal rate.

The Circuit Judge affirmed the Master's report in all particulars except the following: He concluded that immediate termination of the contract as undertaken by the defendant did not comply with the requirement of twelve months' notice and, consequently, there had been no notice of cancella-

tion as provided by the contract. He, accordingly, held that the plaintiff was entitled to recover the salary of Freeman from September 1, 1955 to December 13, 1957, the date of his death.

There are numerous exceptions by defendant but briefly it is contended (1) that Freeman was properly discharged for cause and his estate is not entitled to any salary after September 24, 1955, the date on which he was discharged; (2) that if it be found that he was discharged without cause, in no event would the defendant be liable for salary beyond the expiration of one year from the date of his discharge; and (3) that if the plaintiff is entitled to recover, it is improper to allow interest. Defendant has not appealed from the dismissal of its counterclaim for damages on account of the action brought by Freeman.

"Even though one's services are engaged by another for a definite term, the employer may discharge him for good cause during the term of the employment without incurring liability for breach of contract." 35 Am. Jur., Master and Servant, Section 36, page 470. One of the causes which will justify the dismissal of an employee before termination of the contract of employment is disobedience of the employer's instructions or orders. "Among the fundamental duties of the employee is the obligation to yield obedience to all reasonable rules, orders, and instructions of the employer, and wilful or intentional disobedience thereof, as a general rule, justifies a recission of the contract of service and the peremptory dismissal of the employee, whether the disobedience consists in a disregard of the express provisions of the contract, general rules or instructions, or particular commands. This rule is not restricted to employees in subordinate positions, but applies to those employed in executive or supervisory capacities, although with respect to the latter it is recognized that they are not bound to such strict adherence to directions as is one whose employment involves the exercise of less degree of responsibility and discretion. The fact that an employee holds a position of au-

thority over others, involving the exercise of executory and supervisory powers, does not relieve him from the duty of obedience to orders of the superiors." 35 Am. Jur., Section 44, page 478.

In Fletcher, Cyclopedia of Corporations, Volume 2, Section 351, it is stated: "The power to remove a director or an officer for cause inheres in every corporation as a part of its being."

In *Mitchell v. Toale,* 25 S. C. 238, the Court quoted with approval the following: "The servant is bound to obey all the master's lawful and reasonable commands, even though such commands may, under the circumstances seem harsh and severe, but the master has a right to manage his own affairs, and it must be a very extreme case in which a servant would be justified in refusing obedience to his orders." Also, see 56 C. J. S., Master and Servant, § 42h, page 432; *Spotswood Arms Corporation v. Este,* 147 Va. 1047, 133 S. E. 570.

One of the reasons assigned for the discharge of Freeman is his failure to obey Davis' instruction that he withdraw immediately the suit which he had started. We think Davis was authorized to give this instruction. Under the by-laws the president was given "general supervision of the affairs of the corporation." Under the contract employing Freeman his power to manage the affairs of the corporation was made subject "to the general supervision of the President and the Board of Directors", and he was required to "perform any and all of the duties which may be properly assigned to him by the President or the Board of Directors." If, as plaintiff contends, Freeman was authorized without the consent of the board of directors to institute the action, it would seem that Davis as president and chief executive officer and for all practical purposes the owner of the corporation was empowered to stop it.

Nor can we say that Davis' command was an unreasonable one. He evidently concluded that the continuation of this litigation would be detrimental to

the corporation. This conclusion is not without evidentiary support. He not only instructed Freeman to discontinue the action but directed Matthews and the other officers "to open all records for examination", which gave Freeman every opportunity to inspect the books and have them audited.

The Master and Circuit Judge concluded that there was nothing improper on the part of Freeman in refusing to stop the litigation because under the restraining order issued by the Court he had already been given access to the books and there was nothing further to do except to terminate the case. But the fact that there was little to be gained by continuing the litigation did not relieve Freeman of his duty to obey the instruction given by Davis. Moreover, there is a basis for the claim of defendant that Freeman was seeking in this action not only to gain access to the books but to take over the business. He alleged in his complaint in that action that he had the right "to control the books, records and *employees*." (Italics ours.) The prayer was that the other officers be required to turn over to him not only the books and records but "all other assets of said corporation", and that they be restrained from interfering with him "in conducting the affairs of said corporation." Evidently Judge Eatmon regarded the restraining order procured by Freeman as giving him greater authority than the right to possession of the books because on the following day he found it necessary to modify it by directing that Matthews be "recognized to be the active general manager of King Pontiac Company, Inc., pending the outcome of the rule to show cause." It was necessary for the corporation to employ counsel and it was harassed with this litigation until it was dismissed by Judge Eatmon at the hearing held on September 24th.

Plaintiff seems to have acknowledged that Freeman was in fault for the differences between him and Davis. In a letter to Davis on January 6, 1958, she stated: "I have always personally regretted the differences that came between you and Ed, but I believe that you realize these differences were caused entirely by Ed's not being himself."

This is not a situation where a subordinate officer or employee of a corporation disobeys some trivial or minor instruction given by a superior. The discontinuance of this litigation was a matter of great importance and vitally affected the corporation. We cannot escape the conclusion that the conduct of Freeman amounted to insubordination.

Ordinarily, the question of whether there has been a good and sufficient cause for the discharge of an employee is a question for determination by the triers of the facts but here the facts upon which we rest our decision—that Freeman disobeyed a lawful instruction to stop the litigation—are undisputed and present solely a question of law.

It is next contended that the effort to discharge Freeman was ineffective because (1) there was no quorum at the meeting of the board of directors which purported to discharge him, and (2) that this meeting was held at Bray's Island Plantation in violation of a provision in the by-laws requiring such meetings "be held at the office of the corporation." These questions were not passed upon either by the Master or the Circuit Judge but are raised by plaintiff's sustaining grounds.

While not specifically included in the sustaining grounds, it is argued that the election of the new directors was invalid because it was held at a special meeting of the stockholders. It is said that this could only be done at an annual meeting which the by-laws required to be held on July 15th of each year. It is further argued that "there is no showing of compliance with Article 6, Section 3 (of the by-laws) requiring that the purpose of a special stockholders' meeting be included in the call."

As previously pointed out, no meeting of the stockholders had been held for years. Section 12-353 of the 1952 Code provides: "A failure to hold meetings or elect directors, trustees or managers on the day appointed by the by-laws shall not work a forfeiture of the charter of the company but a meeting may be called thereafter by the president or by the stockholders owning one-fifth of the capital stock of

the corporation, by giving such notice as the by-laws may require for annual meetings."

The stockholders' meeting of September 23, 1955 was called by the president who also owned or controlled practically all of the stock in the corporation. We think this meeting was properly called under the above statute and when held became the annual meeting of the stockholders required to be held by the by-laws. *Walsh v. State,* 199 Ala. 123, 74 So. 45, 2 A. L. R. 551; 13 Am. Jur., page 516.

As to the further point that there is no showing that the stockholders were notified of the purpose of the meeting, this question was not raised in the court below and is not included in the sustaining grounds. Hence, it is not properly before us. We might add, however, that the presumption is that proper notice of the meeting was given. Fletcher, Cyclopedia of Corporations, Volume V, Section 2010. The record disclosed no evidence to rebut this presumption.

We conclude that the election of the new directors was valid. We do not think there is any merit in the contention that the meeting of the directors on September 23, 1955, at which Freeman was discharged, was illegal because it was not held at the office of the corporation as specified by the by-laws. All three of the new directors waived notice of this meeting. Two of them were present. The other has never entered any objection to the meeting and has apparently acquiesced therein. Moreover, this was a closely held corporation almost wholly owned by Davis who was present at the meeting. Under such circumstances, less formality is required in holding meetings. *Industrial Equipment Co. v. Montague,* 224 S. C. 510, 80 S. E. (2d) 114. It would be unreasonable to hold that this meeting was invalid simply because these directors decided to meet at Bray's Island Plantation instead of Columbia.

It follows from the foregoing that the plaintiff is only entitled to recover the salary from September 1 to September

24, 1955 and the 1955 bonus amounting to $1,852.97. The defendant is entitled to recover from the plaintiff the price of the Pontiac automobile amounting to $3,178.99.

The remaining exception relates to interest. The Court below allowed interest at the legal rate on the amounts due by plaintiff to defendant and the amount due by defendant to plaintiff. Defendant objects to interest on the amounts allowed plaintiff upon the grounds (1) that interest was not demanded in the complaint, (2) that the allowance of interest would exceed the amount sought in the complaint, and (3) that the amounts awarded were not liquidated. The first ground was not raised in the Court below and is not properly before us. The amount awarded does not exceed the relief demanded in the complaint. The third ground is without merit. The amounts hereinabove found to be due will draw interest at the legal rate.

The decree of the Circuit Court is reversed and the case remanded for further proceedings in accordance with the views herein expressed.

STUKES, C. J., and TAYLOR, LEGGE and MOSS, JJ., concur.