# Richmond.

## SPOTSWOOD ARMS CORPORATION V. CHARLES ESTE.

June 10, 1926.

1. MASTER AND SERVANT—*Discharge of Servant—Sufficient Cause—Questions of Law and Fact.*—What constitutes a good and sufficient cause for the discharge of the servant is a question of law, and where the facts are undisputed it is for the court to say whether the discharge was justified. But where the facts are disputed, it is for the jury to say upon all the evidence whether there were sufficient grounds to warrant the discharge.

2. MASTER AND SERVANT—*Discharge—Duty of Servant to Obey Master.*—The duty of a servant to comply with all lawful and reasonable orders given by his master with respect to the performance of such functions as fall within the scope of the employment is one of the fundamental obligations which are deemed to be impliedly undertaken as an incident of every contract of hiring. A promise by the servant to obey the lawful and reasonable orders of his master within the scope of his contract is implied by law. Submission to the master's will is the law of the contract.

3. MASTER AND SERVANT—*Discharge—Disobedience.*—It is fundamental of the employee's duty that he shall yield obedience to all reasonable rules, orders and instructions of the employer. Disobedience, as a general rule, justifies a rescission of the contract of service and the preemptory dismissal of the employee, whether the disobedience consists in a disregard of the express provisions of the contract, general rules or instructions, or particular commands.

4. MASTER AND SERVANT—*Discharge—How Right to Discharge Determined.*—The right of an employer to discharge an employee and terminate the relation of master and servant is to be determined with a view to the nature of the service, the duties imposed upon the employee and the terms of the contract of employment. But the question whether, in a given instance, the servant was chargeable with unjustifiable disobedience, is not only to be determined from the provisions of the contract and the nature of the employment, but the circumstances attending the incidents relied upon as evidence of misconduct, and such other elements as may bear upon the issue, should also be considered.

5. MASTER AND SERVANT—*Discharge of Servant for Disobedience—Manager of Hotel—Disobedience Warranting Discharge—Case at Bar.*—In the instant case plaintiff, the manager of a hotel, had repeatedly violated the reasonable rules and regulations of his employer in regard to the financial affairs of the hotel, without valid excuse. He positively refused to discharge a head waiter, who had had a difficulty with a guest, when ordered to do so by his employer. His employer learned that he had consulted the 'guests and other servants as to whether he should discharge the head waiter. In anticipation of his own discharge he had retained funds of the hotel which he should have deposited. Other acts of disobedience appeared in the evidence.

*Held:* That the employer as a matter of law was justified in discharging the manager.

6. MASTER AND SERVANT—*Discharge for Disobedience—Other Acts of Disobedience.*—In an action by a servant for wrongful discharge it was argued that defendant condoned all previous acts of disobedience by retaining plaintiff in its employ, and that they should not, therefore, be considered. But a master may overlook breaches of duty in the servant, hoping for a reformation; and, if he is disappointed and the servant continues his course of unfaithfulness, he may act, in view of his whole course of conduct, in determining whether the contract of employment should be terminated.

7. MASTER AND SERVANT—*Discharge of Servant—Sufficient Cause for Discharge Existing Unknown to Master as Defense to Action by Servant.*—It is well settled that where a sufficient cause exists for the discharge of a servant, although not the inducing motive to the discharge, or even known to the master, it will justify the discharge. The law only requires that there should be an actual breach of the express or implied conditions of the contract in order to justify the discharge, and, if such cause in fact exists, the master may avail himself of such breach in defense of an action brought against him for damages resulting from an alleged wrongful dismissal.

Error to a judgment of the Law and Chancery Court of the City of Norfolk, in proceedings by motion for a judgment for money. Judgment for plaintiff. Defendant assigns error.

*Reversed.*

The opinion states the case.

*James E. Heath,* for the plaintiff in error.

*W. R. Ashburn*, for the defendant in error.

Chinn, J., delivered the opinion of the court.

This is an action brought by the defendant in error, Charles Este, against Spotswood Arms Corporation (plaintiff in error) to recover damages for an alleged wrongful discharge.

The parties will be hereinafter referred to according to the positions they occupied in the court below.

It seems that in the early part of 1924, W. G. Maupin, H. L. Lindsay, W. W. Weaver, A. T. Riddick, Jr., and H. R. Furr formed the corporation above named for the purchase of a hotel at Virginia Beach called the Spotswood Arms. The officers and directors of the corporation were all business or professional men of affairs without any previous experience in the hotel business, and desiring a manager to run the hotel during the summer season, engaged the services of the plaintiff for that purpose. Both the plaintiff and defendant prepared a contract in writing which they respectively claim to contain the terms of the agreement, but neither of these papers were ever signed by either party, and the terms of the contract, in certain particulars, are disputed. It is conceded on both sides, however, that plaintiff was to receive a salary of $50.00 per week during the period of his employment, board and lodging for himself and family, and a bonus of 20% of any net income derived from the operation of the hotel during the season of 1924, after deducting therefrom 10% on the investment represented by the property. It is also undisputed that said season of 1924 should be considered as beginning on the day the hotel was opened for business and ending the Tuesday

following Labor Day, or the 8th of September of that year. It was afterwards agreed between the parties that it would probably be beneficial to the venture if plaintiff were on the ground in order to generally oversee and familiarize himself with the repairs and improvements which the hotel was then undergoing, and likewise make his preparations for the coming season. Plaintiff, accordingly, moved on the premises with his family on the 13th day of March, with the understanding he should receive $50.00 per week, and pay his own living expenses, until the repairs were completed and the hotel opened. Both parties thoroughly understood that this agreement was independent of plaintiff's employment as manager, and it was so treated by them. The hotel was formally thrown open for business on the 24th of May, and the term of plaintiff's term as manager began on that date. It is undisputed that within a week or two after his said term began, considerable dissatisfaction existed on the part of the board of directors of the defendant corporation on account of plaintiff's violation of its directions with respect to the financial affairs of the hotel, of which he was notified and remonstrated with from time to time, as occasion arose; and some friction also developed between Mr. Gagnon, the bookkeeper installed by the defendant, on the one part, and plaintiff on the other, in regard to the same subject. As a result of what had occurred defendant had general survey of the operations of the hotel made by a certified accountant, who, on July 10th, returned a detailed statement of its financial condition, accompanied by a written report, which is as follows:

"On July 9th there were about fifteen guests in the house, some about to leave, with a total income of about $100.00 per day, $42.62 of which was being paid

out in salaries and wages, to say nothing of the cost of food, ice (using 1,800 lbs. per day at a cost of $9.00, more in hot weather) and other expenses.

"It looks like you had a waiter for every two guests. It is evident that it does not require two cooks, two kitchen help and six waiters, besides the head waiter, to serve fifteen or less guests, neither does it require four maids to care for the rooms. As a matter of fact it seemed to me the help had very little to do, as most of them could only be found at meal time.

"You will note an item of $209.54 payable to H. R. Woodhouse in list of invoices payable, $127.50 of this bill, which is for meats, was incurred sometime prior to the opening of the hotel, and it is possible that all or at least a part of this amount is a charge against the account of Mr. Este.

"I note that purchases and receipts are not properly placed and made. It is absolutely impossible to know just where you stand if you don't know just what your invoices payable are, nor what you have received. This you cannot know under the present method of doing things, which is not in accordance with the system. Everything should be properly received, and records made daily, and the chef should not be permitted to buy 'upon his say so' or memorandum. This is very important.

"The petty cash vouchers are rather freely handled. In a good many instances they do not form properly receipted vouchers. The cash receipts have not been deposited as taken in—this should be done without any variations.

"In view of the uncertainty of the amounts owing various creditors, I suggest securing an itemized statement from all creditors from whom anything has been purchased, especially those in and around Virginia Beach;

if you don't do this, and at the same time put some strict regulations into effect regarding purchase, you will find yourself heir to numerous bills long after the hotel has been closed for the season.

"The records show that approximately 1,721 meals were served to guests during June, as compared with 1,723 to employees and office help and management. The cost of the food consumed was $1,383.39 or $46.21 per meal for food. I charged board of employees on this basis, although the average cost thereof may have been slightly less—but I doubt it. However, if such is a fact, the cost of food served guests would be proportionately higher. You can readily see, however, that the ratio of meals served to guests as compared with employees is far from being a healthy one—except for the employees.

"All conditions point to a poor season for the beaches. I suggest that you cut out the expenses to a minimum. You are losing money daily, and unless conditions change it would be cheaper to close the doors or operate a rooming house and the baths.

"It seems that the bookkeeper has not had the time nor place to keep his books and records. It might be well to have some definite understanding as to just what his duties are, and provide a place for the books and records.

"Much more might be said in connection with the operation. However, I have touched upon the most important things. Should you so desire I will be glad to discuss the matter further in person."

On the day this report was received the board of directors held a meeting, at which plaintiff was present and the report discussed, and the next day defendant delivered to plaintiff the following communication:

"Norfolk, Va., July 11, 1924.
"Mr. Charles Este,
  "Spotswood Arms,
    "Virginia Beach, Va.
"Dear Sir:
  "For your information and for our files at Virginia Beach I am inclosing herewith copy of letter from J. D. Oglethrope & Company of July 10th, with recommendations concerning the Spotswood Arms.

  "I am also inclosing copy of trial balance and financial reports gotten up by Mr. Oglethrope.

  "In line with our understanding last night I feel sure that you will cut your expenses to the minimum at once.  The help which we agreed upon to lay off last night was as follows:
  "Two maids,
  "Two waiters,
  "One kitchen boy,
  "Chef.
  "I sincerely hope that you will be able to run the hotel in the future without the friction which has developed in some cases in the past.
  "With best wishes.
            "Very truly yours,
                    "Spotswood Arms Corp.,
                        "H. R. Furr, *Secretary.*"

On the evening of July 13th a disturbance occurred in the dining room of the hotel between the head waiter and a guest, which occurrence was the immediate cause of the dismissal of which plaintiff complains.  This guest had entered the hotel the day before at the suggestion of Mr. Weaver, vice-president and one of the directors of the defendant corporation, who was staying at the hotel with his family.  The evidence as to the

exact provocation for the difficulty is conflicting; it appearing to be undisputed, however, that the guest referred to had been drinking, and was moving around the dining room talking to the other guests seated therein, when the head waiter made a remark to him which he and Mr. Weaver considered overbearing and insulting, as coming from a hotel waiter to a guest, and which both of them resented. Mr. Weaver thereupon sought out the plaintiff and told him he must discharge the waiter at once. This, the plaintiff refused to do. The following night the board of directors held a meeting at the hotel, and after being informed by plaintiff that the waiter was still in his employ, and after having plaintiff's reasons for refusing to discharge him, the board informed plaintiff that he would have to discharge the offending employee or resign. Plaintiff flatly refused to do either, and was thereupon verbally dismissed, and also handed the following formal notice in writing, upon which this action is founded:

"Spotswood Arms, July 14, 1924.
"Mr. Chas. Este,
"Spotswood Arms,
"Virginia Beach, Va.
"Dear Sir:

"Pursuant to conversation of tonight between you and the board of directors of this corporation, you are hereby advised that your services as manager of Spotswood Arms are dispensed with, effective immediately.

"You will please arrange for yourself and your family to leave the premises not later than the evening of July 16th, and also arrange to have such personal effects and property owned by you as are now in the hotel removed therefrom as soon as convenient.

"You will please turn over all such books, records and other property of this corporation as may be in your possession or under your control to Mr. Henri Gagnon, who, beginning immediately, will have charge of the hotel.

> "Spotswood Arms Corporation,
> "By Wm. G. Maupin, *President."*

The jury returned a verdict in plaintiff's favor for $768.00; said sum being salary for eight weeks at $50.00 per week, and allowance for board and lodging for himself and family for the same period at $46.00 per week; and judgment was entered for that amount, to which judgment a writ of error was awarded.

Sundry exceptions were taken as to the instructions given and refused by the trial court, but, in the view we take of the case presented by the record, it is only necessary to consider the assignment of error relating to the action of the court in refusing to set aside the verdict of the jury on the ground that the discharge was justifiable, and that said verdict is, for that reason, contrary to the law and the evidence.

[1] "What constitutes a good and sufficient cause for the discharge of the servant is a question of law, and where the facts are undisputed it is for the court to say whether the discharge was justified. But where the facts are disputed, it is for the jury to say upon all the evidence whether there were sufficient grounds to warrant the discharge." 39 Corpus Juris, page 105, and cases cited.

Looking at the undisputed facts in the instant case we find that almost from the beginning of plaintiff's term of employment as manager of the hotel until the immediate time of his discharge, the defendant had cause to complain, and did frequently complain,

of plaintiff's failure to regard its positive instructions in reference to the conduct of the financial affairs of the hotel.

On this subject Mr. Maupin, president of the defendant corporation, testified as follows:

"Q. With regard to the direction to make deposits of all receipts, as to whether he (plaintiff) obeyed that? Tell the jury what you know about it?

"A. We had borrowed money at one of the banks in Norfolk, and we were anxious for deposits to be as large as possible. We tried to impress that fact on Mr. Este, and told him to make deposits as frequently as possible, so as to make our average balance in the bank as large as possible. We had a lot of trouble about it. He didn't come to town very often, although Mr. Weaver and I told him that we were living at the hotel and would be glad to bring up the deposits. Not only would he not make deposits in the bank frequently enough, but he would take the cash on hand and spend it without putting it in the bank. We took him to task and told him if he put all the money in the bank and we paid the bills by checks, sometimes it would be four or five days before the checks would come through, and always forty-eight hours, and it would make our balance larger. After the bankers convention he took $400.00 or $500.00 around town paying cash without putting it in bank.

"Q. How about your bills for perishables? Were you anxious, or not, that there should be a voucher in every instance?

"A. We tried to make as close study of this proposition as we could, being unfamiliar with it, and our information was that one of the largest sources of leakage is the perishables bought from hucksters at the door, and that will come about by the kitchen

force or from the hucksters. In this system there was a provision for that, because we could not pay them in checks because they were negroes and small hucksters, but for all money that went out there had to be a receipt from the huckster for so many eggs or heads of cabbage, and it was to be entered into the books to make a check. There was a fund of $150.00 in cash given Mr. Este for that purpose. I want to correct an inaccuracy; he said we agreed to give $500.00. He asked for $500.00, but we thought it was too much. We didn't have any receipts and we jacked the bookkeeper up because he didn't have them, and he said that Mr. Este didn't have them. We jacked Mr. Este up about it. There was nothing of cooperation from Mr. Este, but it did work after he left.

"Q. Did you get the receipts from the hucksters after he left?

"A. Yes, sir; there was complaint from the auditor on that source. There was another thing about the payroll; we insisted that the payroll be made up and a check drawn to cover the payroll. In other words, he had so many darkies to pay, and the payroll ran about $175.00 a week. The check for the payroll had to be accompanied by a list of who the money was paid to. The check was countersigned by the proper officer to see that it corresponded with the items. He complained that it was inconvenient, and he was told that if Mr. Weaver would bring up the check for the signature, that we would countersign it and get the cash and send it back by Mr. Weaver, but he would not, to save our lives, make it out; but he would pay the negroes every week in cash.

"Q. State whether or not the board of directors complained to Mr. Este about his refusal to comply with your orders?

"A. Time and time again. We tried not to interfere with Mr. Este in his management of the hotel, but we did insist—Mr. Ashburn (plaintiff's counsel, interposing).

"Q. Are you to be the judge of what would be reasonable regulations?

"A. Yes. When I am employing a man and he is handling my funds, I think I can make reasonable regulations of how he handles them.

"By Mr. Heath (defendant's counsel):

"Q. You were stating you had complained to Mr. Este of his refusal to abide by your directions.

"A. I was trying not to interfere with the management of the hotel. We had spent a good deal of money in putting in the improved hotel system, and we felt sure, with the system in, whether we made money or not, we could tell when we were losing and whether we were losing, and we could check up on it. Realizing that Mr. Este, as manager of the hotel, would have so much on him that he could not keep the books, we hired a bookkeeper to keep the books and instructed him, and told Mr. Este to cooperate with him, in the way of giving access to these records, and make it easy for him to keep the books. It was Mr. Este's failure to cooperate that he could not keep them and he had complained very bitterly from time to time."

None of the above statements are contradicted by the defendant in error, except that he claims it was agreed he should have a cash fund of $500.00, and he needed that amount of cash on hand at all times to run the house. He expressly admits, however, that the board insisted that he deposit the receipts in bank, pay the money out by check, and that he take vouchers for all vegetables, and the like, purchased for the hotel, and excuses his failure to do so merely on the

ground of inconvenience. Without particularizing other instances of violation of instructions on the part of the plaintiff of which defendant complained to him at the time, as shown by uncontradicted evidence, the above quotations from the record may be said to fairly depict the situation existing between the parties in their respective capacities of employer and employee, and the attitude of the defendant in error with respect to carrying out the orders of his employer concerning the financial operations of the hotel, at the time the incident which was the immediate cause of his discharge occurred. .

With regard to the circumstances leading up to and surrounding the actual dismissal of the plaintiff, the evidence shows no material dispute. The version given by Mr. Maupin is this:

"Q. What led up to you telling him that you would dismiss him from service?

"A. For a long time past we had been very dissatisfied with the way the place was run, and we had been trying to get cooperation there and to have it run according to our ideas for the financing of it. We had put up and put up and put up, hoping things would be better. When we were notified about this occurrence, we called a meeting and went down there after dinner on the night of July 14th. We went to the hotel and had this meeting and had Mr. Este in there, and then we understood from Mr. Weaver that there had been this scene there, and to please give his version of it and his reason why he had not discharged the head waiter. Mr. Este went into the matter in considerable length, and he said that he not only had interviewed the witnesses to the controversy or to the disturbance, but that he had interviewed all of the servants in the hotel and asked them what they would

do if he discharged the head waiter, and interviewed all the guests and asked them what they thought he should do about discharging the negro. I hardly believed I had heard him right, and I asked him again, and he told me he had interviewed the help, whether he would be permitted to discharge the servants, and interviewed the guests as to whether he should discharge them. We thought with a thing of that sort that the man should have been discharged immediately. Certainly from the records of the occurrence, we heard that the negro was very insolent to this guest."

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"This is what we told Mr. Este: That it was his duty to discharge him whether the negro thought he was right, or not; that he had no right to be insolent in the hotel. Now, the guests in the hotel—there were only about fourteen there, and the situation was serious which had been created there. Certainly after things had gone this far, that negro must be discharged. He said. 'I absolutely refuse to discharge the waiter.' There was another instance at the same time; on top of that flat refusal, when we got down there that night I discovered Mr. Este made a deposit that day, but the amount of money that he took in for deposit was about $200.00 short of what the book showed. He deposited the checks but had not deposited the cash. I asked him where the cash was, and he told me the cash was in his pocket, and that he intended to keep it—he was anticipating trouble with the board, and that Mr. Weaver had told him to fire him, and he had not done it. I asked Mr. Este: 'Wasn't that money you have taken as our agent?' He said: 'It is.' I said: 'Under that theory do you intend to keep it?' He said that he was going to keep it, and

we had some discussion, and he didn't keep it. It was after that we told him his services would be dispensed with, and we didn't need him any longer."

This account is substantially corroborated by the other three members of the board of directors who were present, and is not contradicted by the plaintiff in any material particular.

The general rule of law relating to the measure of obedience which an employee owes his master is so well established and universally recognized, it would hardly seem necessary to state it. In 1 Labatt on Master & Servant (2nd ed.) section 273, it is stated thus:

[2] "The duty of a servant to comply with all lawful and reasonable orders given by his master with respect to the performance of such functions as fall within the scope of the employment, is one of the fundamental obligations which are deemed to be impliedly undertaken as an incident of every contract of hiring. 'A promise by the servant to obey the lawful and reasonable orders of his master within the scope of his contract is implied by law.' Submission to the master's will is the law of the contract."

[3] "It is fundamental of the employee's duty that he shall yield obedience to all reasonable rules, orders and instructions of the employer. Disobedience, as a general rule, justifies a rescission of the contract of service and the peremptory dismissal of the employee, whether the disobedience consists in a disregard of the express provisions of the contract, general rules or instructions, or particular commands." 18 R. C. L. page 520.

It is contended by the plaintiff that the order to discharge the waiter in this instance was an unreasonable one, for the reason that if he had done so all the

servants would have walked out of the hotel, and he would have been left without any one to serve his guests; but as it is shown that upon the discharge of the waiter that night another head waiter was immediately engaged to take his place, and none of the other employees voluntarily quit the hotel, this excuse necessarily falls to the ground.

[4] Plaintiff also contends that he was justified in his conduct because, under the terms of his contract and the character of his employment, the order to discharge the waiter was an unreasonable interference with his authority as manager of the hotel. It is true that "the right of an employer to discharge an employee and terminate the relation of master and servant is to be determined with a view to the nature of the service, the duties imposed upon the employee and the terms of the contract of employment" (18 R. C. L. page 520); and standing alone as a separate and distinct act of disobedience, the refusal of the plaintiff to discharge the waiter might be considered as unjustifiable, on the ground that the demand was an unreasonable interference with the discretion impliedly vested in him as the manager of the hotel. But it is manifest that plaintiff's action in this instance was but a culmination of a course of previous disobedient conduct which created a crisis in the relation of employer and employee existing between the parties which the board of directors could not ignore, unless they proposed to surrender all reasonable authority and control over their employees in matters affecting the business in which they were engaged. The question whether, in a given instance, the servant was chargeable with unjustifiable disobedience, is not only to be determined from the provisions of the contract and the nature of the employment, but the

circumstances attending the incidents relied upon as evidence of misconduct, and such other elements as may bear upon the issue, should also be considered. 1 Labatt on Master and Servant (2nd ed.) section 274.

[5] The directors of the defendant corporation had substantial financial interests involved in the enterprise—which represented an investment of $52,000.00— and they were naturally anxious to make it a success. Whoever may have been at fault in the difficulty between the waiter and the guest, they believed it would be seriously detrimental to the welfare and success of the hotel to retain the services of the waiter under the circumstances. They had the right and authority to have the business affairs of the hotel conducted in their own way, and to make such rules and regulations therefor as they deemed best for the interests of the venture. The undisputed evidence shows that they had patiently submitted to repeated and persistent violations of their reasonable orders and regulations in regard to the financial affairs of the hotel, hoping to induce the plaintiff to comply with them, although he offered no valid or justifiable excuse for his failure to do so. Notwithstanding all this, plaintiff was not actually dismissed until it was disclosed that he had consulted the guests and servants in the hotel as to what he should do, and, in anticipation of his own discharge, had retained $313.00 which belonged to the hotel and which he should have deposited in bank, upon the ground that a balance was due him on salary, which balance, afterwards, proved to be $152.00. Taking into consideration the previous conduct of the plaintiff throughout his employment, and the circumstances attending his discharge, as shown by the uncontradicted evidence, we

think defendant, as a matter of law, was justified in dismissing plaintiff from its employ as manager of the hotel. He was given every opportunity to comply with the demand made of him, but elected to defy his employer in regard to the matter, and to create a sharp issue between them. Having so chosen, he should abide the consequences.

"There is an obligation on the part of the servant, implied from the contract of employment, to obey the lawful reasonable commands of his master, and a refusal or neglect on the servant's part to obey such a command which, *in view of all the circumstances of the case, amounts to insubordination, and is inconsistent with his duties to his master,* is a sufficient ground for his discharge." 39 Corpus Juris, page 86. (Italics supplied.)

[6] It is argued that defendant condoned all previous acts of disobedience by retaining plaintiff in its employ, and that they should not, therefore, be considered. In *Gray* v. *Shepard,* 147 N. Y. 177, 41 N. E. 500, the court said:

"The claim that the defendant by retaining the plaintiff in his employment after knowledge of violations of duty, thereby condoned these offenses, and they could not thereafter be used as grounds for discharge is without force in view of the fact that his violations were committed from time to time, continuing until the discharge. The master may overlook breaches of duty in the servant, hoping for a reformation; but, if he is disappointed and the servant continues his course of unfaithfulness, he may act, in view of his whole course of conduct, in determining whether the contract of employment should be terminated." See also 39 Corpus Juris, page 88, and cases cited.

It furthermore appears from the undisputed evidence that, up to the time of his discharge, defendant had failed to dismiss the superfluous hotel employees, as recommended by the certified accountant, and as directed by the defendant in its letter to the plaintiff of July 11th, which plaintiff had promised and agreed to do; that plaintiff had contracted a bill for food for himself and family while he was occupying the hotel before his term of employment as manager began, and allowed the bill to be carried as a liability of the defendant on the books of the creditor, without defendant's knowledge or consent. It also appears that plaintiff, likewise without defendant's knowledge, and contrary to its orders, had contracted a bill for the hotel which he purposely withheld from the expert accountant, at the time the survey of the hotel's affairs was made, although he had been expressly directed by defendant to give said accountant a statement of all the bills outstanding against the hotel, and knew the necessity and importance of complying with that order. Without further prolonging this opinion by a discussion of the excuses offered by the plaintiff for his conduct in regard to these several matters, we deem it only necessary to say that, in our opinion, they are insufficient to justify such conduct on his part, and if such acts had been known to the defendant, they would have furnished justifiable ground for his dismissal.

[7] In *Crescent Horse-Shoe Co.* v. *Eynon*, 95 Va. 151, 27 S. E. 935, Judge Buchanan, speaking for the court, said:

"It is well settled that where a sufficient cause exists for the discharge of a servant, although not the inducing motive to the discharge, or even known to the master, it will justify the discharge. The law only

requires that there should be an actual breach of the express or implied conditions of the contract in order to justify the discharge, and, if such cause in fact exists, the master may avail himself of such breach in defence of an action brought against him for damages resulting from an alleged wrongful dismissal."

In *Jerome* v. *Queen City Cycle Co.*, 163 N. Y. 351, 57 N. E. 485, where the superintendent of a large factory, in disobedience of his employer's orders, absented himself for a day to attend to his private business, the court said:

"The plaintiff was, in law, a servant, although of a high grade, with full control and discretion as to hiring and dismissing all the other servants. In other respects he was subject to the reasonable orders of his master, for there was nothing in the contract to relieve him from the duty of obedience required by law. He had charge of an extensive manufactory, where six hundred men were at work. The defendant had the right to manage its own business and to decide whether the services of the plaintiff were necessary at the factory on the day in question. It did so decide and he had no power to overrule the decision, for that would make the master and servant change places. * * * * * It was not reasonable for him to abandon the work he had been employed to do for such a trifling cause, which, as he admits, was purely personal.

"The excuse given by him to justify his disobedience of orders presented no question of fact for the jury, for the law does not permit a servant to defy his master unless serious injury threatens him, his family or his estate. Courts will not permit juries to guess or speculate, when, from the undisputed evidence, it is apparent that the order of the master was reasonable and that the servant was guilty of insubordination."

We are not unmindful of the weight to be attached in a case of this sort to the verdict of the jury and the opinion of the learned trial judge, but upon a careful consideration of the entire case with reference to the undisputed facts and circumstances, we are of the opinion that the judgment should be reversed, and judgment entered here for the defendant.

*Reversed.*