956 F.2d 1163
 NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Burnett S. TREMLETT, Plaintiff-Appellee,
v.
BASSETT MIRROR COMPANY, INCORPORATED, Defendant-Appellant.
 No. 91-2002.
 United States Court of Appeals, Fourth Circuit.
 Argued May 8, 1991.
Decided Feb. 26, 1992.
As Amended May 11, 1992.
 
 Appeal from the United States District Court for the Western District of Virginia, at Danville. Jackson L. Kiser, District Judge. (CA-90-18-D).
 Argued: James Patrick McElligott, Jr., McGuire, Woods, Battle & Boothe, Richmond, Va., for appellant.
 Norman A. Kinnier, Fralin, Freeman & Kinnier, P.C., Lynchburg, Va., for appellee.
 On Brief: Dana L. Rust, McQuire, Woods, Battle & Boothe, Richmond, Va., for appellant.
 Gary M. Coates, Fralin, Freeman & Kinnier, P.C., Lynchburg, Va., for appellee.
 W.D.Va.
 REVERSED AND REMANDED.
 
 
 1
 Before DONALD RUSSELL, Circuit Judge, STAKER, United States District Judge for the Southern District of West Virginia, sitting by designation, and KAUFMAN, Senior United States District Judge for the District of Maryland, sitting by designation.
 
 
 2
 Reversed and remanded by unpublished opinion. Judge Staker wrote the majority opinion, in which Judge Russell joined. Senior Judge Kaufman wrote a dissenting opinion.
 
 OPINION
 STAKER, District Judge:
 
 3
 Appellant Bassett Mirror Company (Bassett) appeals from a judgment against it and in favor of appellee Burnett S. Tremlett (Tremlett) for $225,000, entered upon a jury verdict in the district court,[1] and as grounds therefor claims that court erred. We reverse.
 
 
 4
 It was undisputed that on June 1, 1988, Tremlett entered into a written employment agreement (agreement) with Bassett by which Bassett employed him to act as its President and Chief Operating Officer for a period of three years, beginning on that date, and agreed to pay him an annual salary, in equal monthly installments, of $125,000 during each of the first two years, and $100,000 during the third and last year, of that period. That agreement provided that its terms could be changed "only by an agreement in writing signed by both" Bassett and Tremlett.
 
 
 5
 Tremlett's complaint alleged that pursuant to the agreement, he entered upon his duties as Bassett's President and Chief Operating Officer on June 1, 1988, and continued to perform them until April 21, 1989, when Bassett wrongfully and without just cause discharged him from that employment, and that Bassett had paid to him the salary it had agreed to pay him thereunder through May 31, 1989, the end of the first year of that three-year period, and still owed to him the sum of $225,000 that it had agreed to pay to him during the last two years thereof, which sum he demanded in damages.
 
 
 6
 In its answer, Bassett denied that it had discharged Tremlett, as he alleged, and defensively asserted that he was not entitled to recover in the action because he had committed a material breach of the agreement prior to April 21, 1989, and on that date had quit the employ of Bassett, and that, in any event, he was not entitled to recover from Bassett because he had failed to mitigate any damages to which he otherwise might have been entitled to recover.
 
 
 7
 The issues are those raised by Bassett's assigning as error the trial court's (1) overruling its motion made at the trial that the court direct a verdict in Bassett's favor and against Tremlett, on the ground that the undisputed evidence showed that Tremlett had committed a material breach of the agreement, (2) overruling its post-trial motion for the entry of judgment in its favor notwithstanding the verdict, on the same ground, (3) overruling its post-trial motion to set the verdict aside for Tremlett's asserted failure to mitigate his damages, and (4) improperly instructing the jury.
 
 
 8
 Except as otherwise indicated below, the following facts established by the evidence were not disputed:
 
 
 9
 For many years prior to June 1, 1988, Bassett operated a furniture manufacturing plant located in Bassett, Virginia (Virginia plant), which manufactured wooden furniture. For some time before and shortly after that date Bassett also operated Bassett Mirror Canada and Roy Industries, both located in Canada (Canada plants), at which metal furniture was manufactured.
 
 
 10
 Bassett's officials based at its Virginia plant exercised executive control and management over the operations of both the Virginia and the Canada plants.
 
 
 11
 In early 1988, Tremlett was 66 years old and had been employed in the furniture industry for most of his adult life, having filled top executive and managerial positions with different furniture manufacturers, particularly in the design and marketing aspects of the industry,[2] and was well known therein.
 
 
 12
 For about ten years next preceding June 1, 1988, Tremlett had operated his own concern, Tremlett Associates, Inc., in High Point, North Carolina, which designed items of furniture and sold them to manufacturers, including Bassett. After he commenced his duties at Bassett on June 1, 1988, he devoted all of his time to his duties there and ceased to work at or for Tremlett Associates, Inc.
 
 
 13
 The furniture manufacturing business is a highly competitive one. Stiff competition in the industry, together with consumer demand in the marketplace for ever-changing styles and designs of furniture, impose upon furniture manufacturers inflexible business and economic constraints within which they are necessarily required to operate if they are to continue in business.
 
 
 14
 Bassett and other furniture manufacturers traditionally present their new lines and designs of furniture for sale to prospective buyers at furniture markets or shows held in High Point in April and October of each year. Buyers attend those shows and there order from the manufacturers such quantities thereof as they believe consumers will purchase, and if there is continued consumer demand therefor, continue thereafter to place orders with them therefor, all such orders being called "backorders" in the trade. Obviously, and as the evidence showed, the optimum number of a given item of furniture that should be produced by a manufacturer should equal the number thereof that it knows it can profitably sell, the best measurement of which being the number thereof for which buyers of the item have placed backorders with the manufacturer.[3] After such a show, the manufacturer commences and thereafter continues to produce that number of a given item of furniture that equals the total backorders it has therefor. Accordingly, Bassett carefully and daily monitored its production of, and all backorders placed with it for, every item it produced, including both those placed with it at and following a show, to insure not only that the number thereof produced by it would be sufficient to fill the backorders therefor, but also, and of equal importance, to insure that it did not produce a number thereof in excess of the total of such backorders. If it produced such an excess thereof, that excess accumulated in its inventory, with no assurance that it could be profitably sold. If the excess could not be profitably sold, then in order to dispose of it, Bassett would be required to reduce the selling price thereof by as much as ten to fifty percent, called "discounting" in the trade. Since furniture manufacturers, including Bassett, operate on a profit margin of from only three to five percent, such discounting results in their sustaining losses, the amounts of which depend upon the dollar value of the excess produced and the discounted selling price received therefor. Moreover, it was extremely important for Bassett to maintain cash reserves that were sufficient to carry it through economic recessions and periods during which the market for furniture was lethargic, and it constantly monitored its cash reserves to achieve that end.
 
 
 15
 The seriousness of Tremlett's failure to comply with Bassett's orders and instructions to him, as shown by the evidence, must be viewed in the light of the above described business and economic constraints within which Bassett was necessarily required to operate if it was to remain a viable business.
 
 
 16
 During the months beginning in June, 1988, and continuing to April, 1989, the total amounts of Bassett's cash reserves and inventory, including those at its Virginia and Canada plants combined--the total of each at its Canada plants included in those amounts having been converted from Canadian dollars to their equivalent values in U.S. dollars--were as follows:
 
 
 17
 MonthCash reservesInventory June, 1988$4,186,000$4,931,000 July, 18774,544,0005,086,000 August, 19884,350,0004,812,000 September, 19883,635,0004,880,000 October, 19883,289,0005,110,000 November, 19882,655,0005,033,000 December, 19882,235,0005,536,000 January, 19892,131,0005,962,000 February, 19891,262,0006,318,000 March, 1989 638,0006,895,000 April, 1989 97,0007,560,000
 
 
 18
 From June to September, 1988, the total of Bassett's backorders exceeded its total inventory levels, which was the proper balance between them that Bassett desired to maintain. However, as the above figures show, after the month of September, 1988, Bassett's inventory commenced and continued to increase and its cash reserves commenced and continued to dwindle. Also, after September the total amount of its backorders commenced and continued to decrease from $6,000,000 to below $4,000,000,[4] strongly indicating the industry to be beseiged by a recession in the furniture market.
 
 
 19
 As Bassett's President and Chief Operating Officer, Tremlett was immediately in charge of, and had direct supervision over, all of its operating divisions and the persons who headed them at all of its plants, all of whom reported directly and only to him pursuant to his orders that they do so and that they neither report to, nor discuss any problems with, Spencer W. Morton.
 
 
 20
 Spencer W. Morton (Morton) was Bassett's Chief Executive Officer and the Chairman and a member of its board of directors and also a member of its executive committee, and was Tremlett's immediate superior at Bassett and the officer there to whom Tremlett reported and was answerable. Morton, as well as Bassett's executive committee and board of directors, supported Tremlett and permitted him to operate Bassett without interference from them, at least until December 1, 1988, when, as stated below, Bassett commenced to issue to Tremlett orders and instructions to protect and budget its cash flow, reduce production at its Canada plants, fit inventory at its plants to sales, increase its cash reserves and not to spend those reserves on production.
 
 
 21
 About ten persons were on Basset's board of directors. The members of its executive committee were Morton, Tremlett, and John and Eddie Bassett, each of whom was also a member of its board of directors. Neither John nor Eddie Bassett was employed by Bassett. John Bassett owned one-third of Bassett's corporate stock and had recruited Tremlett to be Bassett's President and Chief Operating Officer.
 
 
 22
 Beginning with Tremlett and going up Bassett's chain of command, Morton was Tremlett's immediate superior, both Tremlett and Morton were answerable to Bassett's executive committee, and the executive committee was answerable to its board of directors.
 
 
 23
 On December 1, 1988, Morton gave Tremlett specific, written instructions to protect Bassett's cash flow and budget its cash. On April 20, 1989, Morton again instructed Tremlett in writing to reduce production in the Canada plants, to fit inventory at the Virginia and Canada plants to sales and to rebuild cash.[5] At a meeting of Bassett's executive committee held in February, 1989, the executive committee instructed both Tremlett and Morton to reduce inventories and increase Bassett's cash reserves.
 
 
 24
 Tremlett took no action whatever to carry out any of those instructions or any action that was even calculated to do so, nor did he instruct any of his subordinates at Bassett to take any such action. In fact, Tremlett acted directly contrary to those instructions; he continued to run two shifts per day at the Virginia and the Canada plants without backorders or sales to warrant the production of the excess furniture thereby produced, and particularly that produced by the Canada plants, which caused Bassett's inventory rapidly to increase and its cash reserves rapidly to decline, both by large amounts. On several occasions, beginning in December, 1988, and continuing into March, 1989, the Canada plants telephoned Tremlett and reported a paucity of backorders, and on each such occasion Tremlett would order Gary Turner, Bassett's director of purchasing, to cause Bassett to order from the Canada plants inordinately large quantities of furniture for which no backorders existed, even though such furniture was not needed. On three of those occasions, Turner asked Tremlett if he really wanted to order such large quantities of furniture, and Tremlett instructed him to do so. On one such occasion Turner discussed with Bill Morton, Bassett's vice-president of manufacturing, the advisability of ordering the large quantity of furniture Tremlett had instructed him to order, and after the two of them discussed the matter with Tremlett, he agreed to delete from the order a part of the furniture to be ordered thereby.[6]
 
 
 25
 Bassett's executive committee met on April 14, 1989, by which time Bassett's backorders had further decreased, its cash reserves were depleted to a dangerously low level and its inventory had substantially increased rather than decreased. At that meeting, Tremlett stated that Bassett would need an additional four to five million dollars, and proposed that Bassett borrow that sum. The executive committee flatly rejected that proposal.[7]
 
 
 26
 On Thursday, April 20, 1989, Bassett's board of directors met. John Bassett did not attend that meeting. After that meeting ended about midday, several of the directors expressed to Morton their dissatisfaction with Tremlett's performance of his duties at Bassett and indicated that they would favor his being requested to resign from his position there. Thereafter, Morton commenced polling Bassett's other directors to ascertain how many of them favored Morton's requesting Tremlett to resign.
 
 
 27
 By the early forenoon of April 21, 1991, Morton had completed polling Bassett's directors, and all of them favored Morton's asking Tremlett to resign except John Bassett, who told Morton that he would not express himself one way or the other on the question until after he had had an opportunity to talk with Tremlett.
 
 
 28
 On April 21, Morton and Tremlett had two separate conversations, one in the morning and the other in the afternoon thereof.
 
 
 29
 On the morning of April 21, Morton went to the office of Joe Smith, Bassett's vice-president of finance, where Tremlett was present, and commenced discussing with Tremlett Bassett's depleted cash reserves and high inventory. Early in that discussion, Tremlett suggested that it be continued in Morton's office to which the two of them then repaired. There, Morton requested Tremlett to resign his office at Bassett, told him that all of Bassett's directors, except John Bassett, had approved of Morton's asking him for his resignation and told him that if he would resign, Bassett would pay him $75,000 per year as a consulting and furniture-designing fee during the remaining two years of the three-year period of his employment provided by the agreement. Tremlett refused to resign and refused that offer, insisting that Bassett was bound by the terms of the agreement, and then left Morton's office.
 
 
 30
 Later that day, Morton telephoned John Bassett, who called a meeting of Bassett's executive committee to convene in Roaring Gap, on the following Sunday, April 24, at 11:00 A.M., for the purpose of his talking with Tremlett as well as discussing Bassett's problems and formulating a plan to deal with them.
 
 
 31
 That afternoon, Morten went to Tremlett's office, saw him clearing out his desk and asked him what he was doing. Tremlett asked Morton to give him a writing stating that Morton had fired him. Morton refused to do so and told Tremlett that he did not have the authority to fire him and also told him that John Bassett had called the meeting of the executive committee in Roaring Gap on the following Sunday at 11:00 A.M., and gave Tremlett directions as to how to drive to the site at which the meeting was to convene. Tremlett then told Morton that he had nothing to discuss with John Bassett and that he would not attend that meeting and indicated that he was leaving Bassett. Morton asked him what he should tell Bassett's employees as explanation for his leaving, and Tremlett told him to tell them that he was "disassociating himself" from Bassett.
 
 
 32
 The testimony of Tremlett and Morton concerning the content of some of the verbal exchanges that passed between them on April 21, and the circumstances surrounding those exchanges, was conflicting in some particulars and was the only evidence that was disputed. That testimony is summarized as follows:
 
 
 33
 Tremlett testified that during their discussion in Morton's office on the morning of April 21, Morton asked him to resign and told him that if he did so, Bassett would continue to pay him the full amount of the salary it had agreed to pay him during the remaining two of the threeyear period of employment provided in the agreement. He further testified that he knew then that Morton had no authority to make such an offer and that he suggested to Morton that he poll Bassett's directors and procure their approval of Morton's making that offer, after which he left Morton's office. He also testified that Morton came to his office that afternoon, told him to leave and asked him for his keys and credit card, which he then delivered to Morton along with three personnel files.
 
 
 34
 Morton testified that when he began the discussion with Tremlett on the morning of April 21, he broached with him Bassett's depleted cash reserves and high inventory. He asked Tremlett what his "game plan" was to deal with those problems, and Tremlett told him he did not have one and asked what he should do. He further testified that he asked Tremlett to resign in a friendly manner and offered, as Tremlett admitted in his testimony, that if Tremlett did so, Bassett would pay to him the $75,000 consulting and furniture-designing fee for each of the remaining two years of his employment under the agreement; that Tremlett refused that offer and became very upset and left Morton's office. He further testified that, on that afternoon, he passed Tremlett's office, saw him clearing out his desk and asked him what he was doing, and Tremlett said he was leaving and handed him his keys, credit card and the three personnel files. He also testified that he never asked Tremlett to leave, but that on that occasion in Tremlett's office he did suggest to him that he take a week's vacation and cool down and they would discuss the matter further upon his return.
 
 
 35
 Near the end of the working day of April 21, Tremlett left his offices at the Virginia plant and Bassett's premises there and never again returned thereto.
 
 
 36
 On the following Monday, April 25, Morton and several other officers of Bassett flew to the Canada plants, shut down their operations and arranged for their inventory there to be brought to the Virginia plant. A great deal of the excess inventory that had accumulated at the Virginia and Canada plants was substantially discounted and sold to provide Bassett with badly needed cash with which to continue to operate. Bassett still had about $500,000 of that inventory on hand at the time of the trial on October 30-31, 1990. For the year 1989, Bassett suffered a $1,000,000 loss of profits, that being the only year during Morton's forty years of employment there that it had ever lost money.[8]
 
 
 37
 Bassett's first two assignments of error--that the district court erred (1) by overruling its trial motion for a directed verdict in its favor, on the ground that the undisputed evidence showed that Tremlett had committed a material breach of the agreement prior to April 21, 1989, and that he quit Bassett's employ, and (2) by overruling its post-trial motion for the entry of a judgment notwithstanding the verdict in its favor, on the same ground--are well taken.
 
 
 38
 Bassett denied that it discharged Tremlett on April 21, 1989, and affirmatively asserted as a defense to his action that even if it had done so, he had committed a material breach of the agreement prior thereto which, as a matter of law, entitled Bassett to have discharged him, wherefore he was not entitled to recover in the action.
 
 
 39
 Since Bassett had the burden of persuasion to establish that defense, it was the proponent of the motion for a directed verdict in its favor based thereon. In such circumstances, as the court held in Allen v. Zurich Ins. Co., 667 F.2d 1162, 1164 (4th Cir.1982), the standard controlling the court's ruling on such a motion as that of Bassett for a directed verdict in its favor, "is in critical respects different from and more demanding than that applicable to the grant of [a] directed verdict against the proponent [here, Bassett]," id. (emphasis supplied), the court going on to state:
 
 As well explained by Judge McLaughlin:
 
 40
 [T]hough a motion for directed verdict in favor of the proponent of an issue is cast in the same form as when made by the defending party, it requires the judge to test the body of evidence not for its insufficiency to support a finding, but rather for its overwhelming effect. He must be able to say not only that there is sufficient evidence to support the finding, even though other evidence could support as well a contrary finding, but additionally that there is insufficient evidence for permitting a different finding. The ultimate conclusion that there is no genuine issue of fact depends not on a failure to prove at least enough so that the controverted fact can be inferred, but rather depends on making impossible any other equally strong inferences once the fact is issue is at least inferable. Mihalchak v. American Dredging Co., 266 F.2d 875, 877 (3d Cir.1959) (footnote omitted); see also United States v. Grannis, 172 F.2d at 513.
 
 
 41
 In Crinkley v. Holiday Inns, Inc., 844 F.2d 156, 160 (4th Cir.1988), the court stated the standard which controls the court in its ruling upon a motion for judgment notwithstanding the verdict to be as follows:
 
 
 42
 Under the federal standard, applied alike at trial and on review, the evidence and all reasonable inferences from it are assessed in the light most favorable to the non-moving party, Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 243 n. 14 (4th Cir.1982), and the credibility of all evidence favoring the non-moving party is assumed. Tights, Inc. v. Acme-McCrary Corp., 541 F.2d 1047, 1055 (4th Cir.1976). Assessed in this way, the evidence must then be "of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment could reasonably return a verdict for the non-moving party...." Wyatt v. Interstate & Ocean Trans. Co., 623 F.2d 888, 891 (4th Cir.1980). A "mere scintilla of evidence" is not sufficient to withstand the challenge, Gairola v. Virginia Dept. of Gen. Services, 753 F.2d 1281, 1285 (4th Cir.1985) (citation omitted).
 
 
 43
 In Spotswood Arms Corporation v. Este, 133 S.E. 570 (Va.1926), Spotswood entered into an agreement with Este for him to manage its hotel for the tourist season from about June 1 to Labor Day of 1924. He commenced his duties and repeatedly failed to follow Spotswood's instructions, including those that he promptly deposit in the bank the hotel's receipts, procure receipts for cash paid to vendors of food to the hotel, retain no more than a given sum in the hotel's petty cash fund, disclose to Spotswood's accountant the existence of all of its accounts payable, and to dismiss superfluous hotel employees. On July 14, he refused to comply with instructions to him by Spotswood's board of directors that he discharge a waiter at the hotel who had spoken insolently to one of its guests, and the board of directors discharged him. He sued Spotswood, a jury awarded him damages equal to the salary he would have earned for the remainder of his employment had he not been discharged, the trial court overruled Spotswood's motion to set aside the verdict and enter judgment in its favor and it appealed.
 
 The court stated:
 
 44
 "What constitutes a good and sufficient cause for the discharge of the servant is a question of law, and where the facts are undisputed it is for the court to say whether the discharge was justified. But where the facts are disputed, it is for the jury to say upon all the evidence whether there were sufficient grounds to warrant the discharge." 39 Corpus Juris, p. 105, and cases cited.
 
 
 45
 Id. at 573.
 
 
 46
 The general rule of law relating to the measure of obedience which an employee owes his master is so well established and universally recognized, it would hardly seem necessary to state it. In 1 Labatt on Master and Servant (2d Ed.) § 273, it is stated thus:
 
 
 47
 The duty of a servant to comply with all lawful and reasonable orders given by his master with respect to the performance of such functions as fall within the scope of the employment is one of the fundamental obligations which are deemed to be impliedly undertaken as an incident of every contract of hiring. 'A promise by the servant to obey the lawful and reasonable orders of his master within the scope of his contract is implied by law.' Submission to the master's will is the law of the contract.
 
 
 48
 It is fundamental of the employee's duty that he shall yield obedience to all reasonable rules, orders and instructions of the employer. Disobedience, as a general rule, justifies rescission of the contract of service and the peremptory dismissal of the employee, whether the disobedience consists in a disregard of the express provisions of the contract, general rules or instructions, or particular commands. 18 R.C.L. p. 520.
 
 
 49
 Id. at 574.
 
 
 50
 There is an obligation on the part of the servant, implied from the contract of employment, to obey the lawful and reasonable commands of his master, and a refusal or neglect on the servant's part to obey such a command which, in view of all the circumstances of the case, amounts to insubordination, and is inconsistent with his duties to his master, is a sufficient ground for his discharge. 39 Corpus Juris, p. 86. (Italics supplied.)
 
 
 51
 ....
 
 
 52
 ... The master may overlook breaches of duty in the servant, hoping for reformation; but, if he is disappointed and the servant continues his course of unfaithfulness, he may act, in view of his whole course of conduct, in determining whether the contract of employment should be terminated.
 
 
 53
 Id. at 575 (quoting Gray v. Shepard, 147 N.Y. 177, 41 N.E. 500 (1895)).
 
 
 54
 And finally, the court said and held that "upon a careful consideration of the entire case with reference to the undisputed facts and circumstances, we are of the opinion that the judgment should be reversed, and judgment entered here for the defendant [Spotswood]." Id. at 576.
 
 
 55
 The undisputed evidence established that Tremlett took no action whatever, nor caused any of his subordinates to do so, to comply with Bassett's repeated, reasonable and lawful instructions and orders to him, beginning in early December, 1988, to protect and budget its cash flow, to reduce production at the Canada plants, to fit inventory at the Virginia and Canada plants to sales, to reduce its inventory and to increase its cash reserves. Rather, the undisputed evidence established that, contrary to those instructions and orders, Tremlett caused Bassett's plants, and more particularly its Canada plants, to operate two shifts per day and to manufacture an amount of furniture greatly in excess of that justified by any sales thereof or backorders therefor, thereby creating an ever larger inventory, and that he caused the Virginia plant to place inordinately large orders for furniture unneeded by it with the Canada plants, and continued to do so as late as March 15, 1989. The undisputed evidence further established that his failure to comply with those orders and instructions caused Bassett's cash reserves to decrease from $2,235,000 to $97,000, and its inventory to increase from $5,536,000 to $7,560,000, during the period from December, 1988, to April, 1989, notwithstanding that its backorders decreased from $6,000,000 to less than $4,000,000 during that period.
 
 
 56
 Applying the principles of law stated in Spotswood Arms Corporation v. Este, supra, the undisputed evidence established that those failures of his to comply with those reasonable and lawful orders and instructions constituted a violation and breach of his duties owing to Bassett, and constituted a material breach by him of the agreement.
 
 
 57
 Applying the standard in Allen v. Zurich Ins. Co., supra, there was no evidence in the record whatever to support a finding other than that Tremlett had committed a material breach of the agreement. The undisputed evidence was such that it overwhelmingly established that he had done so, and there was no evidence from which a contrary finding possibly could have been made. Accordingly, the trial court erred by overruling Bassett's motion for a directed verdict.
 
 
 58
 Applying the standard in Crinkley v. Holiday Inns, Inc., supra, there was no evidence in Tremlett's favor in respect to which any credibility was to be assumed, and assessing the undisputed evidence and all reasonable inferences therefrom in the light most favorable to him, he being the non-moving party, that evidence was of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment could not return a verdict in his favor. Thus, the trial court also erred by overruling Bassett's motion for judgment notwithstanding the verdict in its favor.
 
 
 59
 Regardless of whether Tremlett quit Bassett's employment or was discharged by it, the undisputed evidence clearly established that he had theretofore materially breached the agreement, and his doing so as a matter of law precluded him from recovering against Bassett under the principles stated in Spotswood.
 
 
 60
 Our resolution of the first two errors assigned by Bassett being dispositive of its appeal, we need not address the remaining two of them.
 
 
 61
 The judgment entered by the district court is vacated and it is instructed to enter judgment notwithstanding the verdict in favor of Bassett and against Tremlett.
 
 
 62
 REVERSED AND REMANDED.
 
 KAUFMAN, Senior District Judge, dissenting:
 
 63
 Judge Kiser, in the court below, in denying Bassett's post-trial motion for judgment notwithstanding verdict, stated that "the evidence indicates that no specific instructions were given to Tremlett until 19 and 20 April 1989 ... just before plaintiff left Bassett Mirror.
 
 
 64
 Further, it was undisputed that Tremlett presented a plan to deal with the problems at the executive committee meeting on April 14, 1989, roughly one week before he left Bassett Mirror...." Trial transcript at 576. In the light of that evidence, this is not a case in which "there was insufficient evidence for permitting a different finding," Mihalchak v. American Dredging Company, 266 F.2d 875, 877 (3d Cir.1959), i.e. insufficient evidence for permitting a finding that Bassett did not prove by a preponderance of the evidence that Tremlett, obviously a strong-willed man who had his own reasons for running the company as he did, disobeyed his employer's instructions. Accordingly, I would affirm Judge Kiser's refusal to disturb the jury's verdict.
 
 
 65
 I, therefore, respectfully dissent.
 
 
 
 [1]
 The district court had diversity jurisdiction of the action pursuant to 28 U.S.C. § 1332, the amount in controversy therein exceeding $50,000, exclusive of interest and costs, and it having been undisputed that when the action was commenced, Tremlett was a citizen and resident of North Carolina and Bassett's principal place of business was in Virginia
 
 
 [2]
 Tremlett testified that he was a "marketing consultant."
 
 
 [3]
 Gary Turner, Bassett's director of purchasing and monitor of its inventory vis-a-vis its backorders at its Virginia plant, testified that it was always well to maintain the inventory at a level somewhat lower than the backorders
 
 
 [4]
 Joseph Smith, Bassett's controller, so testified
 
 
 [5]
 Tremlett admitted in his testimony that such instructions were then given to him by Morton. When asked why he did nothing to carry them out, he answered, "I used the best judgment I had to run that company."
 
 
 [6]
 Turner testified that it was difficult to question anything Tremlett had ordered his subordinates at Bassett to do--that Tremlett had dismissed several of Bassett's employees, including the son-in-law of one of its directors
 
 
 [7]
 John Bassett testified that he was peeved by Tremlett's failure to have followed the instructions given him beginning in December, 1988, that he act to conserve Bassett's cash and reduce its inventory, and that he chastised Tremlett at that meeting for his failure to have done so
 
 
 [8]
 The facts set forth in this paragraph bear little if any materiality to the issues here other than to demonstrate the effect upon Bassett, at least in large part, of Tremlett's causing it to produce furniture far in excess of that justified by its backorders therefor while he acted as its President and Chief Operating Officer